EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
GRACE JUN: SBN 287973
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525
FAX: (619) 233-3221
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

THE ESTATE OF DEVON
RIDEOUT, by and through LESLIE
WOODS as successor-in-interest;
and LESLIE WOODS as an
individual,

        Plaintiffs,

v.

THE UNITED STATES OF
AMERICA,

        Defendants.

CASE NO.: **'22CV0278 JLS  WVG**

**COMPLAINT**

**(1)** **Negligence (FTCA)**

**(2)** **Negligence** *Per Se* **(FTCA)**

**(3)** **Wrongful Death (FTCA)**

COMES NOW Plaintiffs, the ESTATE OF DEVON RIDEOUT, by and through LESLIE WOODS as successor-in-interest; and LESLIE WOODS, an individual, by their attorneys of record and allege and complain as follows:

## I.

## INTRODUCTION

This case arises out of the negligence of the United States and its agents whose conduct was a substantial factor in causing the death of 24-year-old Devon Rideout (hereinafter "Devon"). The negligence of the Department of Defense ("D.O.D"), the U.S. Navy and the agents and employees of these entities consisted of the failure to comply with duties imposed by law. These laws required the reporting of information regarding persons prohibited from buying firearms to the FBI maintained computer database. The purpose of reporting is to prevent persons such as felons and the mentally incompetent from being able to purchase guns from federally licensed firearms sellers. Despite four reports of the D.O.D Inspector General over a span of two decades specifically identifying widespread and inexcusable failures to comply with the mandatory reporting obligation, the D.O.D. and the U.S. Navy failed to enter information which would have prevented Devon's killer from acquiring the gun he used to kill her.

On July 20, 2018, Devon was shot dead steps away from her front door by Eduardo Arriola (hereinafter "Arriola"). Arriola had been diagnosed with schizophrenia and committed for mental health treatment in an attempt to restore his competency after he had been adjudicated mentally incompetent to stand trial for desertion in a military court-martial. As such, he was prohibited from purchasing or possessing a firearm under federal law. Despite this, Arriola purchased a firearm from the Iron Sights Shooting Range in Oceanside, California, which he used to ambush and execute Devon Rideout outside her apartment.

Leslie Woods, the mother of Devon Rideout, individually and on behalf of the Estate of Devon Rideout, brings this Complaint against Defendant United States (hereinafter "the Government") under the Federal Torts Claim Act ("FTCA"), 28 U.S.C. §§ 1343(3) and (4),1346(b) and 2671-2860. The failures of the Government to comply with the law to collect, maintain, and report required information about Arriola allowed him to purchase the firearm he used to kill Devon Rideout.

## II.
## GENERAL ALLEGATIONS

1.     Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §§ 1331, 1346(b), 2401, and 2671-80.

2.     Venue is proper in the Southern District of California because the acts or omissions which form the basis of Plaintiffs' claims occurred in San Diego, California, County.

3.     At all relevant times mentioned herein, decedent Devon Rideout was an individual residing in San Diego County, California.

4.     At the time of her death, Devon Rideout was married but separated from her husband, Gabriel Zamora, Ms. Rideout and Mr. Zamora were living separate and apart. The rift in her marriage was  final and irreconcilable.  Devon had begun divorce proceedings and informed her mother she had no intention of remaining with her husband or reconciling with him.  Because decedent Devon Rideout's cause of action arose while she was living separately from her husband, any money or other property to be received for personal injury damages is Devon Rideout's separate property.  *See* Cal. Fam. Code § 781(a) ("Money or other property received or to be received by a married person in satisfaction of a judgment for damages for personal injuries, or pursuant to an agreement for the settlement or compromise of a claim for those damages, is the separate property

of the injured person if the cause of action for the damages arose as follows . . .
(2) While the injured spouse is living separate from the other spouse.").

5. Mr. Gabriel Zamora, moreover, has assigned his rights to recover under any claim of Devon's estate to Leslie Woods, Devon's mother.

6. Devon Rideout had no children at the time of her death. Her father is deceased. Her only surviving parent is her mother, Plaintiff Leslie Woods. As such, Plaintiff Leslie Woods is the heir and beneficiary to the Estate of Devon Rideout under the laws of intestate succession because this cause of action is decedent's separate property. Cal. Prob. Code § 6401(c). For this reason, Leslie Woods is decedent Devon Rideout's successor-in-interest and succeeds to Devon Rideout's causes of action. *See* Cal. Code Civ. Proc. §§ 377.10(b), 377.11, and 377.30. (*See also* Exhibit 1, declaration of Leslie Woods, incorporated herein by reference.)

7. This action on behalf of the Estate of Devon Rideout is brought by Leslie Woods, Devon's mother, as successor-in-interest. No proceeding for administration of the estate is pending and Leslie Woods is the successor-in-interest under California law and succeeds to the decedent's interests, claims, and causes of action. There is no other person with a superior right to commence this action.

8. Leslie Woods brings this action in her own right, as well, for the loss of her daughter, Devon Rideout, under Cal. Code Civ. Pro. § 377.60(a).

9. Plaintiffs Estate of Devon Rideout and Leslie Woods have properly complied with the claims procedures required under 28 U.S.C § 2675. Their claims were timely submitted to the Office of the Judge Advocate General Torts Claim Unit.

10. On October 18, 2021, the United States rejected Plaintiffs' FTCA claim.

- 3

11.     Plaintiffs have exhausted all administrative remedies and the current action is timely filed within the applicable statute of limitations.

12.     Defendant is the United States of America. At all relevant times mentioned herein, and on information and belief, the negligence resulting in Devon's death was that of U.S. military personnel, contractors, sub-contractors, and/or agents of the U.S. military.

### III.

### FACTUAL BACKGROUND

13.     Plaintiffs hereby reallege all prior paragraphs of this Complaint and incorporate the same herein by reference as if these paragraphs were fully set forth herein.

14.      On July 20, 2018, Eduardo Arriola shot and killed Devon Rideout, a Navy hospital corpsman, near her apartment in Oceanside, California.  Arriola lived in the apartment above Devon's, but they otherwise had no relationship or connection.

15.     Devon had just returned from work.  She was still in uniform as she left her apartment to walk her new puppy.

16.     Arriola shot Devon between 3:00 and 4:00 p.m.  He emptied his gun when he killed Devon, shooting her three times in her chest and torso, and twice in her head.

17.     Devon died only steps from the front door of her apartment.  She was 24 years old.

18.     After Arriola shot Devon, he refused to let bystanders try to render medical aid.  Arriola was still at the scene when police arrived.  He told police he had used lethal force because "she was trespassing."

19.     In Arriola's car, located nearby, police found a list of names, including Devon's name.  The list had "R.I.P." written at the bottom of the page.

- 4

20.    The weapon Arriola used to kill Devon Rideout was a five shot .38 caliber revolver.  Arriola had purchased this firearm from Iron Sights Shooting Range, a federally licensed gun retailer located in Oceanside. Arriola had acquired this weapon he used to kill Devon only weeks before, in May 2018.

21.    Eduardo Arriola was a member of the U.S. Marines from August 16, 2011 through September 29, 2017.  In December 2014, Arriola was admitted to the Camp Lejeune Naval Hospital for "bizarre behavior and hyper religiosity."

22.    After his release from the hospital on December 23, 2014, Arriola was absent without authorization.  In 2016, after being AWOL for nearly a year and a half, Arriola was arrested and charged by court-martial with desertion.

23.    On May 4, 2016, Arriola's counsel made a request for a review of his mental competency.  After a psychiatric review of his competence, the military judge found Arriola incompetent to stand trial.

24.    On July 20, 2016, pursuant to R.C.M. 909(l) and 18 U.S.C. § 4241(d), the military court committed Arriola to the custody of the U.S. Attorney General for a determination as to whether he would be able to attain mental competency to stand trial.

25.    On December 2, 2016, the psychiatric facility wrote to the military presiding over the court-martial the following: "It is the opinion of our clinical staff that Cpl. Arriola's mental condition, despite three months of competency restoration treatment, has not so improved to the extent that he is presently competent to proceed and is substantially unlikely to be restored to competency within the foreseeable future, in the absence of psychiatric medication."

26.    The Federal Bureau of Prisons diagnosed Arriola as schizophrenic with disorganized thoughts and behavior, as well as auditory hallucinations and delusions.  Because of his mental incompetency, the military elected to discharge Arriola.  He was rated as having a 100% "service-related disability.

**A.  The Law Required the Navy to Report Arriola to the NICS' Computer System.**

27.    By way of several pieces of key legislation spanning almost 30 years, Congress acted to block individuals who represent a known risk of violence from purchasing firearms. To that end, Congress mandated that certain individuals must be flagged in the instant criminal background check system used by firearms sellers nationally in the interest of public safety.

28.    The U.S. Navy and the Department of Defense (hereinafter "DoD"), both agencies of defendant United States of America, ignored a statutory mandate that required Arriola's entry into the background check system because of adjudication as mentally incompetent and his involuntary commitment based on that finding.

29.    As a direct result of the Marine Corp's, the Navy's and the DoD's failure to flag Arriola in the FBI database, Arriola was permitted to purchase the firearm he ultimately used to gun down Devon at her doorstep.

30.    1n 1993, Congress passed Section 103 of the Brady Handgun Violence Prevention Act, which required the Attorney General of the United States to establish a National Instant Criminal Background Check System "(NICS)" that firearms sellers must use to determine whether the proposed sale of a firearm violates 18 U.S.C. § 922. Pursuant to 18 U.S.C. § 922(t) a licensed firearms dealer is prohibited to sell or transfer a firearm to any person without first contacting the national instant background check system.

31.    Federal law requires the Government and its agencies to report ineligible firearm purchasers to the national database. Specifically, and without limitation, 34 U.S.C. § 40901(a)(1)(C) requires that federal agencies which have "any record of any person demonstrating" that the person should not be able to purchase a gun "shall not, less frequently than quarterly, provide the information contained in the record to the Attorney General for the National Instant Criminal Background Check System." Likewise, 34 U.S.C. § 40901(e)(1)(D) creates an

- 6

obligation on agencies to correct and update their records. Federal law prohibits persons who have been found mentally incompetent from purchasing or possessing firearms. Firearms cannot be sold to a person whom the seller knows or has reasonable cause to believe is someone who has been adjudicated as a mental defective or has been committed to any mental institution. 18 U.S.C. § 922(d)(4). These categories of individuals are likewise prohibited from possessing or receiving firearms. 180.US.C.§ 922(g)(4).

32.   To implement these federal laws, the Department of Justice established the National Instant Criminal Background Check System (NICS). Congress, through the Brady Act, established the NICS Indices, which contains information provided inter alia by federal agencies, of persons prohibited from purchasing firearms under federal law. The NICS responds instantly to background check inquiries by querying the NICS Indices, the National Crime Information Center, and the Interstate Identification Index.

33.   In California, the established legal process  requires licensed firearms dealers to notify the California Department of Justice of a prospective purchase of a firearm. The California Department of Justice serves as the point of contact ("POC") between the federal firearms licensee, who is the prospective seller, and the federal government, which maintains the NICS database of prohibited persons.

34.   NICS includes four federal databases. Two of these – the Interstate Identification Index (III) and the NICS Index – contain records that identify disqualified persons who may not possess firearms due to an adjudication regarding that individual's mental or developmental disability.

35.   The California Department of Justice conducts computer inquiries, including reviewing the federal NICS database, to determine whether the prospective purchaser of the weapon is precluded by law from acquiring it. Convicted felons, persons discharged dishonorably from military service, persons

under domestic violence restraining orders, and those found to be mentally incompetent to stand trial are among those forbidden to buy or possess firearms under federal law. The California DOJ is required to access the records available through NICS as part of its review.

36.    Federal law prohibits the sale of a firearm to one who has been found by a court, board, commission, or other lawful authority to be a danger to self or others, or has been found to "lack the mental capacity to contract or manage [their] own affairs," as a result of mental condition or illness.

37.    Federal regulations state this firearm prohibition applies when a person has been found incompetent to stand trial or been found not guilty of a crime due to mental incapacity; or, has been involuntarily hospitalized or committed to a mental health or substance abuse treatment facility by a court, board, commission, or other lawful authority.

38.    Federal departments and agencies that have information about people prohibited from possessing firearms must submit records to the United States Attorney General for inclusion in NICS. This includes people who have become subject to the mental health prohibition.

39.    To implement the Brady Act, interagency discussions were held during 1996 to 1997 about who should be considered "adjudicated as a mental defective" for the purposes of gun control. The ATF largely led those discussions because it was the agency principally responsible for administering and enforcing federal gun control laws.

40.    On June 27, 1997, the ATF promulgated a final rule defining the following terms:

> "Committed to a mental institution" means a formal commitment of a person to a mental institution by a court, or other lawful authority. The term includes commitments: (1) to a mental institution involuntarily; (2) for mental defectiveness or mental illness; or (3) for

other reasons, such as drug use. The term does not include a person who is admitted to a mental institution for observation or who is voluntarily admitted.

"Mental institution" includes mental health facilities, mental hospitals, sanitariums, psychiatric facilities, and other facilities that provide diagnoses by licensed professionals of mental retardation or mental illness, including psychiatric wards in general hospitals.

41.    According to the Bureau of Justice Statistics, there were: 298,571 prohibiting records related to persons "adjudicated as a mental defective" or "committed [involuntarily] to a mental institution" in the NICS index as of January 1, 2007. Of those records, state and local authorities had contributed 159,418 records (53.4%). According to the FBI, there were 6,396,842 active prohibiting records on persons "adjudicated as a mental defective" or "committed [involuntarily] to a mental institution" in the NICS index as of December 31, 2020. Of those records, state and local authorities had contributed 6,133,617 records (95.9%). From the beginning of 2007 to the end of 2020, the number of those records contributed by state and local authorities to the NICS index increased by 3,747.5%.Federal agencies had contributed 263,225 such records to the NICS index. By comparison, federal agencies had contributed 139,153 records to the NICS as of January 1, 2007.

42.    Congress required federal agencies to formulate implementation plans for complying with federal reporting requirements that direct them to provide the FBI with access to any firearms-related prohibiting records for NICS-facilitated background checks. Federal agencies are required to certify semi-annually that they are complying with these laws and submitting all prohibiting records on at least a quarterly basis to the FBI.  Political appointees within a federal department or agency that fails to comply with these federal requirements and underlying implementation could forfeit bonus pay.  The United States Attorney General is required to report semi-annually to Congress and the public

on federal agencies and states that fail to either create or obtain substantial compliance with their implementation plans.

43.    At all times relevant to this complaint, federal statutes, federal regulations, and Department of Defense Instruction Number ("DODI") 5505.11 mandated that criminal history data from military court martial proceedings, including the determination of incompetence to stand trial, be reported by the Department of Defense to the Attorney General for inclusion in the NICS index, for use by federal and state agencies to determine who was prohibited from firearms purchases and possession.

44.    The mandatory reporting obligation regarding fingerprint card and final disposition report submission requirements were set forth in DODI 5505.11 (July 9, 2010) and made applicable in successive instructions thereafter.

45.    DODI 5505.11 "[e]stablishes policy, assigns responsibilities, and prescribes in accordance with part 20 of title 28 of the Code of Federal Regulations and section 534 of title 28, United States Code (U.S.C.) (References (c) and (d)) for Defense Criminal Investigative Organizations (DCIOs) and other D.O.D. law enforcement organizations to report offender criminal history data to the Criminal Justice Information Services (CJIS) Division of the Federal Bureau of Investigation (FBI) for inclusion in the National Crime Information Center criminal history database."

46.    The Instruction noted that it:

"d. Updates procedures in cases involving violations of chapter 47 of title 10, U.S.C. (Also known and hereafter referred to as "The Uniform Code of Military Justice" (UCMJ)) data to the CJIS Division from the point when charges are referred to an earlier point when an agent or other law enforcement investigator determines, following coordination with the servicing Staff Judge Advocate (SJA) or legal advisor if necessary, that probable cause exists to believe that the subject has committed an offense listed in Enclosure 2 of this Instruction, but in no

- 10

case earlier than apprehension (military), arrest (civilian), or the subject interview.

e. Rescinds the option of holding Federal Document (FD-249), "Suspect Fingerprint Card", in anticipation that final disposition will be available within 60 days. FD-249 shall be submitted in accordance with this Instruction, and final disposition will be recorded and submitted using an FBI/Department of Justice Form R-84, "Final Disposition Report."

47.    DODI 5505.11 applies to "OSD, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense (IG D.OD.), the Defense Agencies, the D.O.D. Field Activities, and all other organizational entities within the D.O.D. (referred to collectively in this instruction as the 'DoD Components')."

48.    The Department of Defense Instruction set forth the mandatory procedure for D.O.D. component to report the final disposition to the FBI CJIS (Criminal Justice Information System) Division:

"b. Offender criminal history data records required in accordance with this Instruction shall be initiated by preparing and submitting a FD-249 and, when required, an R-84, or their electronic equivalents, to the CJIS Division.

(1) For military subjects (investigated by a DCIO or other D.O.D law enforcement organization), the FD-249 shall be submitted when an agent or law enforcement official determines, following coordination with the servicing SJA or legal advisor if necessary (in no case earlier than apprehension (military), arrest (civilian), or the subject interview), that probable cause exists to believe that the person has committed an offense listed in Enclosure 2. If applicable, such coordination shall be documented in the investigative file.

(2) If applicable, approval of a request for discharge, retirement, or resignation in lieu of court-martial, and/or a finding of lack of mental competence to stand trial, shall be recorded as "final disposition" either on the FD0249 or R-84.

(3) Within 15 calendar days after a final disposition of military judicial or nonjudicial proceedings, or the approval of a request for discharge, retirement, or resignation in lieu of court-martial, disposition information shall be reported by the DCIO or other D.O.D. law enforcement organizations on the R-84, or an electronic data transfer equivalent, if it has not already been reported on an FD-249. Do not hold the FD-249 or R-84 pending appellate actions. Appellate action affecting the character of an initial disposition must be reported if it occurs. Dispositions that are exculpatory in nature (e.g., dismissal of charges, acquittal) shall also be documented on the R-84."

**B. Despite Mandatory Directives, D.O.D. Agencies' Pervasive Failures to Report Critical Information Repeatedly Allows Dangerous Offenders to Obtain Firearms.**

49.    Despite these mandatory laws, regulations, and Department of Defense Instructions, the military criminal investigation organizations (MCIOs) and the other service law enforcement sectors have failed abysmally to fulfill their obligations.[1]

50.    The Department of Defense Inspector General issued a report in February 1997 regarding D.O.D.'s compliance with criminal history reporting requirements. The Inspector General noted:

---

[1] The military criminal investigation organizations (MCIOs) are: the U.S. Army Criminal Investigation Command; the Air Force Office of Special Investigations; and the Naval Criminal Investigative Service, which services the Navy and the Marine Corps. The MCIOs are responsible for investigating most major crime in Military Departments, including general crime and fraud. In this case, the Navy was responsible for reporting Arriola's prohibited status because Arriola was a U.S. Marine.

"The MCIOs are not consistently submitting criminal history data to the FBI criminal history files. Based on the results of statistical sampling, the Army failed to send FD-249, Suspect Fingerprint Card, to the FBI in approximately 82 percent of its cases; the Navy 83 percent; and the Air Force 38 percent. Failure to submit the R-84, Final Disposition Report, in the Army was 79 percent; the Navy 94 percent; and the Air Force 50 percent. In addition to the MCIOs investigating offenses described in CPM No. 10, other Service law enforcement organizations conduct investigations described in CPM No. 10 and do not consistently report that data.

As a result, the lack of reporting to the FBI criminal history files prevents civilian law enforcement agencies from having significant information on military offenders."

51.    This evaluation was performed to satisfy a requirement in Public Law 104-106, "National Defense Authorization Act for Fiscal Year 1996" (the Authorization Act).  Section 555 of the Act, "Report on the Consistency of Reporting of Fingerprint Cards and Final Disposition Forms to the FBI," states:

(a) REPORT.--The Secretary of Defense shall submit to Congress a Report on the consistency with which fingerprint cards and final disposition forms, as described in Criminal Investigations Policy Memorandum 10 issued by the Defense Inspector General on March 25, 1987, are reported by the Defense Criminal Investigative Organizations to the Federal Bureau of Investigation for inclusion in the Bureau's Criminal history identification files. The report shall be prepared in consultation with the Director of the Federal Bureau of Investigation.

(b) MATTERS TO BE INCLUDED.-In the report, the Secretary shall

(1) survey fingerprint cards and final disposition forms filled out in the past 24 months by each investigative organization;

- 13

(2) compare the fingerprint cards and final disposition forms filled out to all judicial and nonjudicial procedures initiated as a result of actions taken by each investigative service in the past 24 months;

(3) account for any discrepancies between the forms filled out and the judicial and nonjudicial procedures initiated;

(4) compare the fingerprint cards and final disposition forms filled out with the information held by the Federal Bureau of Investigation criminal history identification files;

(5) identify any weaknesses in the collection of fingerprint cards and final disposition forms and in the reporting of that information to the Federal Bureau of Investigation; and

(6) determine whether or not other law enforcement activities of the military services collect and report such information or, if not, should collect and report such information.

(c) SUBMISSION OF REPORT.--The report shall be submitted no later than one year after the date of the enactment of this Act.

52.    28 U.S.C.§ 534 states the Attorney General shall "acquire, collect, classify and preserve" criminal history information and shall "exchange such records and information" with other law enforcement officials. The Criminal Information Services Division, Federal Bureau of Investigation, is designated for compiling and disseminating criminal history record information.

53.    Procedures for reporting criminal history record information are delineated in the Code of Federal Regulations (CFR) at 28 CFR 20.30 *et. seq*. Agencies use two forms to submit information to the Criminal Information Services Division: FBI Form FD-249, Suspect Fingerprint Card (FD-249), and FBI/Department of Justice Form R-84, Final Disposition Report (R-84).

- 14

54.    On March 25, 1987, the Deputy Inspector General, Department of Defense, issued Criminal Investigations Policy Memorandum Number 10 (CPM No. 10), Criminal History Data Reporting Requirements. This memorandum established the policies and procedures under which the Defense Criminal Investigative Organizations (DCIOs) within the DoD report offender criminal history data to the Federal Bureau of Investigation (FBI). The memorandum requires that DCIOs submit offender criminal history data to the FBI on all Service members they investigate who are the subjects of any resultant judicial or nonjudicial military proceeding. Reporting is accomplished through submission of the FD-249 and R-84.

55.    Multiple Inspector General reports paint a picture of a decades-long failure by the military to share its criminal history information with the FBI. The Department of Defense Office of Inspector General (OIG), the military's official watchdog agency, has completed multiple investigations indicating that record sharing has been a continuous problem.

56.    The 2014 Department of Defense Inspector General's report found the military did not report criminal records to the FBI's Uniform Crime Report despite a federal law requiring it to do so. "The FBI uses the data to develop a reliable set of criminal statistics for U.S. law enforcement agencies," the report said. "We found D.O.D. does not report criminal incident data to the Federal Bureau of Investigation (FBI) as required by the Uniform Federal Crime Reporting Act of 1988 and DoD Directive 7730.47."

57.    A 2015 investigation examined whether the military branches had improved their reporting of fingerprint and arrest records. While the report found [some] improvement in the percentage of records being reported, it still found large holes in compliance with the law. It found 72 percent of fingerprint records were properly submitted while only 70 percent of arrest records made it to the FBI.

58.    In a report of December 4, 2017, the Inspector General issued a report on "The Evaluation of Fingerprint Card and Final Disposition Report Submissions by Military Service Law Enforcement Organizations."    The Inspector General found that the Marine Corps failed to submit 29% of required fingerprint cards and 36% of final disposition reports.

59.    The Inspector General's 2017 findings, made twenty years after the original 1997 report, showed continuous violations of the law:

> The FBI NGI database is a national computerized system for storing, comparing, and exchanging fingerprint data and criminal history information for law enforcement purposes.
>
> The FBI NGI's primary function is to provide the FBI a fully automated fingerprint identification and criminal history reporting system. The failure to populate the NGI with all the required fingerprint records can allow someone to purchase a weapon who should not, hinder criminal investigations, and potentially impact law enforcement and national security interests.
>
> We determined that the Military Services did not consistently submit fingerprint cards and final disposition reports as required. Overall, of the 2,502 fingerprint cards required to be submitted, 601 (24 percent) were not submitted. Of the 2,502 final disposition reports required to be submitted, 780 (31 percent) were not submitted.
>
> The results differed by Service. As shown in the following table, the Army, Navy, and Marine Corps failed to submit many such fingerprint cards and final disposition reports, as required. The Air Force performed better, but still had missing fingerprint cards and final disposition reports.
>
> Within the Services, the Army, Navy, and Marine Corps had more missing fingerprint cards and final disposition reports. The Army had 262 (28 percent) missing fingerprint cards and 385 (41 percent) missing final disposition reports. The Navy had 197 (29 percent)

1
2
3

missing fingerprint cards and 243 (36 percent) missing final disposition reports. The Marine Corps had 37 (29 percent) missing fingerprint cards and 46 (36 percent) missing final disposition reports.

4
5
6

60.    In 2017 the Inspector General made a set comprehensive recommendations, all of which were agreed to by the Secretaries of the Army, Navy, and Air Force:

7
8
9
10

We recommend that the Secretaries of the Army, Navy, and Air Force ensure that all fingerprint cards and final disposition reports that we identified as not submitted during the period of our review, from 2015 through 2016, be promptly submitted to the FBI CJIS.

11
12
13
14
15
16
17
18
19
20
21

We recommend that the Secretaries of the Army, Navy, and Air Force; the Under Secretary of Defense for Intelligence; and the Deputy Chief Management Officer immediately perform a comprehensive review of their criminal investigative databases and files to ensure that all required fingerprint cards and final disposition reports for qualifying offenses at least to 1998 have been submitted to FBI CJIS in compliance with DoD and FBI requirements. We recommend that the review extend back to at least 1998 because that is when DoD policy required the Military Services to submit such qualifying fingerprints and final disposition reports. We recognize that all these records may not still be available, but we recommend the reviews determine what information can and should be submitted.

22
23
24
25
26
27
28

We recommend that the Secretaries of the Army, Navy, and Air Force; the Under Secretary of Defense for Intelligence; and the Deputy Chief Management Officer take prompt action to institute command, supervisory, and management oversight controls to verify compliance with fingerprint card and final disposition report submission requirements, in the past and in the future, and also ensure that such compliance is included as a special interest item in Service Inspector General inspections.

We recommend that the Secretaries of the Army, Navy, and Air Force; the Under Secretary of Defense for Intelligence; and the Deputy Chief Management Officer conduct a comprehensive review of their criminal history reporting programs to ensure fingerprinting and final disposition report submission policy, training, and processes are consistent with DoDI 5505.11, the DoD policy covering the submission of fingerprints and final disposition reports, and are being implemented.

We recommend that the Secretaries of the Army, Navy, and Air Force; the Under Secretary of Defense for Intelligence; and the Deputy Chief Management Officer also ensure that other required investigative and criminal history information, such as criminal incident data and Deoxyribonucleic Acid (DNA) samples, has been submitted for inclusion in FBI databases.

61.    The Inspector General report issued findings showing that the Naval Criminal Investigations Service (which reports Marine Corps. Criminal Data) was repeatedly failing in its reporting obligations:

| Service | | Fingerprint Card Submissions | | | | Final Disposition Report | | | |
|---------|---|---|---|---|---|---|---|---|---|
| LEO | Convictions | Submitted | | Not Submitted | | Submitted | | Not Submitted | |
| Navy | 682 | 485 | 71% | 197 | 29% | 439 | 64% | 243 | 36% |
| NCIS | 631 | 472 | 75% | 159 | 25% | 428 | 68% | 203 | 32% |
| Navy SF | 51 | 13 | 25% | 38 | 75% | 11 | 22% | 40 | 78% |
| Total | 2,502 | 1,901 | 76% | 601 | 24% | 1,722 | 69% | 780 | 31% |

62.    The Department of Defense has failed in its obligation to follow the law; flouted its duty to victims of gun violence, including Devon Rideout; and been inexcusably derelict in doing what the law requires.

///
///
///
///
///

- 18

# IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Negligence (FTCA)
### [By the Estate of Devon Rideout against United States of America]

63.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

64.    The United States Department of Defense, including the U.S. Marine Corps. and the Naval Criminal Investigation Service  failed to use ordinary care and failed to do that which persons of ordinary prudence would have done under the same or similar circumstances by failing transmit information about Eduardo Arriola's adjudication of mental incompetence to the FBI.

65.    After Arriola was adjudicated as mentally incompetent to stand trial and then committed to the Federal Bureau of Persons' for treatment to determine whether his competency could be restored, no one in the Department of Defense U.S. Marine Corps, U.S. Navy or the Naval Criminal Investigative Service reported to the FBI, CJIS or NICS that he was a prohibited person, had been found incompetent and was forbidden to purchase a firearm.

66.    On or about May 8, 2018, Eduardo Arriola filled out a form 4473, falsely swearing that he was not prohibited from purchasing a firearm. The firearms dealer, Iron Sights Shooting  Range, reported the prospective purchase, and Arriola's information to the point of contact, the Firearms Division of the California State Department of Justice.

67.    Had D.O.D. properly reported the required information, the NCIS system would have unequivocally and immediately identified Arriola as a prohibited person, and the sale would have never occurred.

68.    The Firearms Division through a state criminal data base, did find that Arriola had been arrested on the military warrant on April 26, 2016 by the

Sheriff's Office in Oakland, California. Finding, nothing in the NICS database, an employee of the State of California apparently contacted a representative of the Department of Defense.

69.    In correspondence related to the denial of Plaintiff's FTCA claim the U.S. government has alleged that even though the D.O.D. never reported Arriola's prohibited status to NICS, the United States is not liable because of a "superseding cause" of Devon's death, specifically the subsequent alleged negligence of the California Department of Justice.

70.    The United States claims that in May 2018, the California D.O.J. requested that the U.S. provide "the type of court martial" Arriola received for the arrest of April 2016. Instead of clearly communicating that Arriola was prohibited from purchasing a firearm under federal law, the federal official allegedly attached the "FBOP Transfer Package ICO Prisoner Arriola" noting that Arriola was transferred to the Federal Bureau of Prisons due to being found incompetent to stand trial by courts martial. Because California state law is different than federal law in its treatment of incompetence to stand trial as a basis to prohibit firearms acquisition, this lack of clear communication following the complete absence of any notation of Arriola's prohibited status in NICS, resulted in the failure by any agency to order the gun seller to cancel the sale. On or about May 22, 2018, Arriola acquired the .38 handgun, and less than two months later, murdered Devon Rideout with it.

71.    The United States' assertion that failing to notify the NICS system of the prohibited status of Arriola at any time in 2016, 2017, or 2018 was not the cause of Devon's death, is in error. If the D.O.D. had entered the data as required, Arriola could not have purchased the firearm. The California D.O.J. would have been informed immediately that Arriola was prohibited. The failure of the United States, even after it was notified that Arriola was seeking to purchase a firearm and had falsely completed the ATF Form 4473, to clearly and unequivocally

convey to the California Department of Justice that under federal law Arriola was a prohibited person, absolutely forbidden to purchase a firearm, was negligent. Moreover, Plaintiffs do not know whether the communication defendant United States claims it made to the California Department of Justice employee was properly sent and timely received. Further, given the difference between federal and state law, it was reasonably foreseeable that the failure of the United States to state clearly "Arriola is forbidden under federal law to acquire a firearm" or words to that effect, would result in the lack of a timely order to the FFL to abort the sale.

72.    The negligence of defendant United States was a substantial factor in the causation of the death of Devon Rideout.

73.    Defendants' negligence was a substantial factor in causing Plaintiff's physical and emotional harm. As a direct, legal, proximate and foreseeable result of Defendants' negligence, Plaintiff has been damaged in an amount according to proof at the time of trial, including, but not limited to economic loss and pain and suffering. Under Code Civ. Proc. § 377.34, amended by S.B. 477 and effective January 1, 2022, decedent Devon Rideout is entitled to damages for her pain, suffering, or disfigurement.

## SECOND CAUSE OF ACTION
### Negligence *Per Se*
### [By the Estate of Devon Rideout against United States of America and Does 1-10]

74.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

75.    The United States Congress required the creation of a national background check system upon passage of the Brady Bill. To implement this system, the Department of Justice created the National Instant Criminal Background Check System.

76.     The Department of Defense implemented policies, procedures, manuals, and instructions—and acted under the color of these regulations—regarding the reporting of individuals who have been adjudged to be mentally defective and those discharged from the Armed Forces under dishonorable conditions.

77.     The United States, through its agencies, undertook to operate a national background check system and did in fact operate a national background check system.

78.     The law imposing the obligation of the D.O.D. to report Arriola's prohibited status created a mandatory duty to do so. Moreover, all components of the D.O.D. agreed, in response to multiple I.G. reports, that they would discharge this obligation. The United States failed to properly report Arriola's prohibited status in violation of its duty. This unreasonable and negligent conduct was a substantial factor in the death of Devon Rideout.

79.     Defendants' negligence was a substantial factor in causing Plaintiff's physical and emotional harm. As a direct, legal, proximate and foreseeable result of Defendants' negligence, Plaintiff has been damaged in an amount according to proof at the time of trial, including, but not limited to economic loss and pain and suffering.  Under Code Civ. Proc. § 377.34, amended by S.B. 477 and effective January 1, 2022, decedent Devon Rideout is entitled to damages for her pain, suffering, or disfigurement.

### THIRD CAUSE OF ACTION
### Wrongful Death
### [By Plaintiff Leslie Woods against United States of America and Does 1-10]

80.     Plaintiffs hereby reallege all prior paragraphs of this Complaint and incorporate the same herein by reference as if these paragraphs were fully set forth herein.

81.    Leslie Woods is the mother of decedent Devon Rideout.  She brings this action in her own right for the loss of her daughter.

82.    Ms. Woods has standing for a wrongful death claim because she is entitled to decedent Devon Rideout's separate property by intestate succession and Devon had no children.  *See supra.* at ¶¶ 4-9.

83.    Ms. Woods brings this action for the loss of the society, care, companionship and support of her daughter, Devon Rideout.

84.    Defendant failed to use reasonable care to prevent harm to Plaintiffs.

85.    Defendants had a duty to use reasonable care, diligence and prudence in their conduct towards Devon Rideout.  Defendants breached that duty which proximately caused the resulting injury and actual loss or damage resulting from their negligence.

86.    Defendants' negligence and violation of mandatory statutory responsibilities were a substantial factor in causing Plaintiffs' physical and emotional harm.  As a direct, legal, proximate and foreseeable result of defendants conduct Plaintiff Leslie Woods has been damaged in an amount according to proof at the time of trial, including, but not limited to economic loss, the loss Devon Rideout's society and companionship.

## V. PRAYER FOR RELIEF

Plaintiffs pray for judgment as follows:

1) Economic damages according to proof;

2) Noneconomic damages according to proof;

3) Costs of suit, including but not limited to expenses for expert testimony; and

4) Any other relief the Court deems just and proper.

1

2   DATED March 1, 2022

3

4

5

6

7

Respectfully submitted,

**IREDALE AND YOO, APC**

s/ Eugene Iredale

EUGENE IREDALE
JULIA YOO
GRACE JUN
Attorneys for Plaintiffs
Estate of Devon Rideout et al.

- 24